**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION**

| | |
|---|---|
| EYAL HANFLING, individually and on behalf of all others similarly situated, | CASE NO.: |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| GRINNELL COLLEGE, | |
| Defendant. | |

Eyal Hanfling ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, brings this Class Action Complaint against Defendant Grinnell College ("Defendant" or "Grinnell"). Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1. In recent years, federal courts across the country have warned that opaque digital-tracking practices pose a profound threat to Americans' privacy. The unauthorized collection of a person's browsing activity, website interactions, and personal identifiers constitutes an invasion of the most basic expectation of privacy in one's online life. When a company affirmatively represents that users may control whether their data is sold, shared, or tracked, but then secretly sells, shares, and tracks that data anyway, the misconduct is especially egregious.

2. Grinnell is a private liberal arts college located in Grinnell, Iowa.[1]

---

[1] *About Grinnell*, GRINNELL COLLEGE, https://www.grinnell.edu/about (last visited May 11, 2026).

3.      Grinnell operates a website, https://www.grinnell.edu/ (the "Website"), through which users may explore information about the college's academic programs, admissions process, campus life, faculty, and student resources; apply for admission and financial aid; create and manage user accounts through college-related portals; access educational, administrative, and support services; and engage with college news, events, and other institutional offerings.

4.      Like many modern websites, the Website displays a cookie banner (the "Cookie Banner") purporting to give users meaningful control over what data the Website shares with third parties. The Cookie Banner represents to users that the Website will not use cookies to track users until they click the "I Agree" button.



*Figure 1 – Cookie Banner on the Website*

5.      Defendant's assurances are false. The Website begins placing and transmitting cookies and other third-party tracking technologies (the "Tracking Tools") capable of intercepting and transmitting users' data, including communications, the moment users visit the Website, before they can interact with the Cookie Banner.

6.      The Tracking Tools collect detailed interaction and behavioral data, including users' selections of links, buttons, forms, and other on-page elements, as well as information entered into search fields. This data may include webpages viewed, academic or admissions-related content accessed, forms submitted, and users' interactions with Website content; inferred interests, preferences, age, location, or other characteristics based on user behavior and content engagement; and personal, device, and technical identifiers such as device type, operating system, and browser type. The data also includes persistent identifiers that enable recognition of users

2

across sessions and websites, users' email addresses, and approximate geolocation information derived from IP addresses or similar signals. Collectively, this information is referred to as "Sensitive Information." This Sensitive Information is collected the moment a user arrives on the Website.

7. The Website utilizes and deploys Tracking Tools which transmit users' Sensitive Information to the advertising, social media, and analytics companies that designed and operate the Tracking Tools, such as TikTok, Meta, Google, and Reddit (the "Tracking Entities").

8. Grinnell's Cookie Banner deceives users by representing that cookies would only be set if users clicked on the "I Agree" button, while the Website (1) places Tracking Tools on users' browsers, allowing Tracking Entities to intercept users' communications with the Website before users have the opportunity to provide affirmative consent through the Cookie Banner, and (2) continues to use Tracking Tools that intercept and transmit users' information to Tracking Entities despite the absence of any meaningful assent by users to the tracking technologies.

9. Grinnell's Website design and procurement of Tracking Entities and Tracking Tools to monitor, intercept, and transmit user data constitute invasion of privacy, intrusion upon seclusion, and fraud. By representing that cookies would be placed only if users affirmatively consented to tracking, while continuing to deploy Tracking Tools before obtaining such consent, Defendant effectively deprives users of meaningful control over their personal information.

10. In short, the Website's Cookie Banner materially misleads users about the use, sharing, and sale of their data. Defendant lulls users into a false sense of security, privacy, and control while simultaneously enabling third parties to monitor, intercept, and transmit users' online behavior in real time without their consent. Such conduct deprives users of control over their Sensitive Information and violates fundamental privacy protections.

11.     Plaintiff fell victim to Defendant's deception. Plaintiff visited Defendant's Website in or around July 2024 for ordinary informational and educational purposes, including exploring academic programs, admissions information, campus resources, student-life content, and to otherwise peruse the Website's content.

12.     While accessing the Website from his home state, Plaintiff encountered the Cookie Banner. Relying on Defendant's representations that Tracking Tools would be used only upon users clicking "I Agree," Plaintiff did not provide affirmative consent and/or click "I Agree"; Plaintiff continued to use the Website. Despite these actions and reasonable expectations, Defendant deployed Tracking Tools, including cookies, that automatically intercepted, recorded, and transmitted Plaintiff's Sensitive Information to the Tracking Entities before obtaining affirmative consent from Plaintiff and without providing a meaningful mechanism for users such as Plaintiff to reject tracking and/or manage the use, sharing, and/or sale of their Sensitive Information.

13.     Accordingly, Plaintiff was subjected to the unauthorized disclosure of his Sensitive Information and deprived of the benefit of his privacy choices.

14.     Defendant's conduct, therefore, violated the federal Wiretap Act, 18 U.S.C. § 2510, et seq.; New York's General Business Law, including N.Y. Gen. Bus. Law ("GBL") §§ 349 and 350; and common law, including invasion of privacy, intrusion upon seclusion, fraud and deceit, and unjust enrichment.

15.     Plaintiff brings this action on behalf of himself and a putative class of similarly situated users harmed by Defendant's deceptive and unlawful practices.

**JURISDICTION AND VENUE**

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e). This Court has supplemental jurisdiction over the non-federal claims in this action. This Court also has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

17.     This Court has personal jurisdiction over Defendant because Defendant is registered to do business in this District and maintains its principal place of business in this District.

18.     Venue is proper in this Court because Defendant's principal place of business is located in this District and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

**PARTIES**

19.     Plaintiff Eyal Hanfling is, and at all relevant times has been, a citizen and resident of the State of New York. Plaintiff Hanfling accessed and used Defendant's Website while physically located in New York. Most recently, Plaintiff Hanfling visited the political science page of the Website in or about July 2024. In connection with his visit to Defendant's Website, Plaintiff Hanfling was presented with Defendant's Cookie Banner, which he did not interact with in any manner. Plaintiff Hanfling reasonably believed that, absent any affirmative consent to tracking technologies, his browsing activity would not be tracked beyond what was strictly

necessary for the Website's basic functionality. Despite Plaintiff Hanfling's lack of consent to tracking, Defendant deployed third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff Hanfling's browsing activity, device identifiers, and related metadata to the Tracking Entities. The interception disclosed the substance of Plaintiff Hanfling's communications with the Website, including the webpages he viewed, such as information about political science, together with identifiers and related metadata. These Tracking Tools operated despite Plaintiff Hanfling never providing affirmative consent to non-essential tracking technologies. As a result, Plaintiff Hanfling's Sensitive Information was intercepted and disclosed without his consent. Had Plaintiff Hanfling known that Defendant would deploy Tracking Tools and disclose his information to third parties absent his consent, he would not have continued to use the Website.

20.    Defendant Grinnell College is a private liberal arts college organized under the laws of the State of Iowa, with its principal place of business in Grinnell, Iowa. Grinnell College provides undergraduate educational programs and related academic, residential, and student services through its Website, https://www.grinnell.edu/.

## FACTUAL ALLEGATIONS

### I.    How Websites Function

21.    Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

22.    Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[2]

23.    Each webpage has a unique address, and two webpages cannot be stored at the same address.[3]

24.    When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[4]

25.    An IP address is "a unique address that identifies a device on the Internet or a local network."[5] Essentially, an IP address is:

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.[6]

26.    When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfills this request, it issues an HTTP response that includes the request status and, typically, the requested content. This content is then transmitted

---

[2]    *Browsing the Web*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn_web_development/Getting_started/Environment_setup/Browsing_the_web (last visited May 7, 2026).

[3] *Id.*

[4]    *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited May 7, 2026).

[5]    *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited May 7, 2026).

[6] *Id.*

in small chunks, known as data packets, and reassembled into the complete webpage by the user's browser upon arrival.[7]

27.    This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure. [8]

28.    The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[9] as depicted below:



*Figure 2 - Mozilla's diagram of a URL, including parameters*

29.    Website owners or web developers write and manage the URLs for their websites.

30.    URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[10] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

---

[7] *Id.*

[8]    *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited May 7, 2026).

[9] To see examples of how Defendant used parameters to provide additional information here, *see, infra,* Section C(2).

[10] *Id.*

31.     The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[11] Today, UTF-8 is the Internet's most common character encoding.[12]

32.     URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[13] To demonstrate:



*Figure 3 – Demonstrating URL encoding and decoding[14]*

33.     Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.

---

[11]     *HTML ASCII Reference*, w3 Schools, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited May 7, 2026).

[12] *UTF-8*, Mozilla, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited May 7, 2026).

[13] *What Is URL Decoding and URL Encoding?*, Gochyu (last modified May 5, 2026) https://gochyu.com/blog/url-encode-decode (last visited May 7, 2026).

[14] Viraj Shetty, *URL Encoding in a few minutes*, YouTube (Sept. 5, 2023) https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited May 7, 2026).



*Figure 4 – Sample webpage used to demonstrate a webpage URL*



*Figure 5 – Request URL of sample webpage from Figure 4, encoded for transmission (compare with decoded URL in Figure 6)*



*Figure 6 – Decoded, parsed data from Request URL in Figure 5, showing easy-to-read parameters and metadata*

34.     After sending the Request URL, and after the server responds to the Request URL, the user's browser assembles the packets sent by the server back into the HTML code of the webpage, which is then processed by the user's browser, as it arrives,[15] and rendered into a visual

---

[15] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built into the browser to create images on the screen. This means that, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received. *See What Is a URL*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn_web_development/Howto/Web_mechanics/What_is_a_URL (last visited May 7, 2026).

11

display according to the instructions of the HTML code.[16] This is the visible, and usually interactable, website that most people think of.

35.    To provide more complex website functionality, website developers will include more complex commands written in other computer programming languages, such as JavaScript snippets, within the HTML documents.[17]

36.    Such complex tasks include code used to monitor and report user activity.

37.    In short, the Internet relies on a constant back-and-forth stream of requests and responses between a user's browser and a website's stored code and data. Importantly, the requests and responses provide a perfect snapshot of everything a user does (or does not do) on a website, when and how they do it, and with what software and hardware.

38.    Unbeknownst to users, as they browse the Website, the Tracking Tools, including third and first-party cookies, capture and record both incoming and outgoing requests and responses that make up their entire experience on the Website.

## II.    Defendant Programmed the Website to Use Tracking Tools, Including Cookies

39.    When users interact with the Website by navigating pages, clicking links, entering information, submitting forms, or accessing academic, admissions, and student-related resources, they communicate directly with Defendant.

40.    Defendant voluntarily integrated Tracking Tools from various Tracking Entities into its Website's programming. Defendant's inclusion of such tools on its Website is performed

---

[16]    *What Is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn_web_development/Howto/Web_mechanics/What_is_a_URL (last visited May 7, 2026).

[17]    *See JavaScript: Adding interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited May 7, 2026).

pursuant to commercial agreements between Defendant and third parties, including Tracking Entities.

41.     The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically transmitted back to web servers via HTTP requests, allowing the Website and third parties to identify the device making the request and to record a session reflecting how the user interacts with the Website, i.e., everything they view, click, type, or even hover over.

42.     First-party cookies are those placed directly on the user's device by the web server with which the user is knowingly communicating, in this case, Defendant's Website. First-party cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity.

43.     Third-party cookies are placed by domains other than the Website's domain, such as google.com, facebook.com, and other advertising or analytics domains. When a user's browser loads a webpage containing embedded third-party resources, the third party's scripts determine whether its cookies already exist on the user's device and, if not, cause those cookies to be stored. These third-party cookies contain unique identifiers that allow third parties to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

44.     As detailed further below, Tracking Tools, including first and third-party cookies, that are placed on users' devices are subsequently used to intercept and record users'

communications by the Tracking Entities, enabling them to surreptitiously track and collect Website users' Sensitive Information in real time.

45.     Tracking Tools serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering user preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on user profiles; and (iv) social media integration. Ultimately, Tracking Tools enable Defendant and Tracking Entities to earn more money and enhance marketing effectiveness through the collection, analysis, and dissemination of users' Sensitive Information, especially as users' Sensitive Information is used to build detailed marketing profiles of users to enhance the effectiveness and efficiency of Tracking Entities' and Defendant's marketing efforts.

46.     This Sensitive Information has independent, quantifiable value in the marketplace, and that value was directly diminished by Defendant's unauthorized disclosure of such data.[18]

**III.    The Website's Cookie Banner Misled Plaintiff**

47.     When Plaintiff visited the Website, the Website immediately displayed the Cookie Banner. The Cookie Banner read as follows:

> We use cookies to enable essential services and functionality on our site, enhance your user experience, provide better service through personalized content, collect data on how visitors interact with our site, and enable advertising services. To accept the use of cookies and continue on to the site, click "I Agree." For more information about our use of cookies and how to opt out, please refer to our website privacy policy.

---

[18] Helena Vieira, *The economic value of personal data for online platforms, firms and consumers*, THE LONDON SCHOOL OF ECONOMICS AND POLITICAL SCIENCE (Jan. 19, 2016) https://blogs.lse.ac.uk/businessreview/2016/01/19/the-economic-value-of-personal-data-for-online-platforms-firms-and-consumers/ (last visited May 7, 2026).

48.     The Cookie Banner further presented users with buttons labeled "I Agree" and "Privacy Policy."

49.     These representations create a reasonable expectation that the Website's tracking system is 'opt-in,' i.e., tracking does not occur unless the user affirmatively consents. The Cookie Banner disappears if a user clicks the "I Agree" button. The Cookie Banner also provides a "Privacy Policy" button directing users to additional information regarding Defendant's use of cookies and purported opt-out information.



*Figure 7 – Grinnell's Cookie Banner, representing that users can manage the use of cookies or the sharing or sale of personal data*

50.     The Website purports to inform users about Defendant's use of Tracking Tools through the Privacy Policy referenced in the Cookie Banner. Though the Cookie Banner indicates affirmative consent is required, the Privacy Policy references available *opt-out* information, thereby indicating that users may exercise some degree of control over the collection and use of their personal information associated with cookies and tracking technologies.

51.     After the Cookie Banner was displayed, users were permitted to continue browsing the Website even if they did not click "I Agree." At that point, Defendant continued to deploy Tracking Tools and transmit user information to Tracking Entities without obtaining affirmative consent through a meaningful opt-in mechanism.

52.     Defendant's representations in its Cookie Banner led users to believe that cookies would not be deployed unless users affirmatively clicked "I Agree."

53.     Defendant did not abide by Plaintiff's expectations regarding privacy and consent. Although the Cookie Banner represented that users could accept cookies by clicking "I Agree,"

Defendant deployed Tracking Tools before obtaining affirmative consent and without providing a meaningful mechanism to reject or manage non-essential tracking technologies.

## IV.    Defendant's Website Used Tracking Tools

54.    Defendant installed Tracking Tools on the Website created by Tracking Entities. These Tracking Tools operate invisibly, tracking Website users' activity surreptitiously by intercepting the Plaintiff and users' Sensitive Information as it arrives at or is sent from users' devices, copying the contents of those communications, and generating new Request URLs that are transmitted to the Tracking Entities.

55.    Generally, the Tracking Tools collect information about users' site activity when events specified by the Defendant, like adding a product to the shopping cart or loading specific webpages, are triggered. Defendant added parameters to events that determine just how much data is collected, and how specific that data is.

56.    Parameters are strings of text that website owners add to a URL to track and organize their webpages.[19] URL parameters include key-value pairs formatted as "key=value."

      a.    The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event).

      b.    The "value" is the specific setting or data for that parameter (e.g., "yellow" or "AddToCart" for a user taking the action of adding a product to their online shopping cart).

---

[19] Yongi Barnard, *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (last updated Feb. 5, 2026) https://backlinko.com/url-parameters (last visited May 7, 2026).



*Figure 8 - Diagram of a URL displaying how parameters function*[20]

### A.    The TikTok Pixel

57.    TikTok offers software known as a "tracking pixel" to track users' actions, behavior, and conversions across the Website (the "TikTok Pixel").

58.    The TikTok Pixel is a snippet of code that begins to collect information the moment a user lands on the Website, before any pop-up or cookie banner advises them of the invasion or seeks their consent. To use the TikTok Pixel, the website operators, including Defendant, must include the specific pixel IDs associated with their websites, which allows TikTok to link the intercepted data back to their individual TikTok business profiles.[21]

59.    Defendant's TikTok Pixel ID is included in transmissions sent to and from users' devices, as seen in *Figure 12*. The "code" variable in *Figure 12* identifies the TikTok Pixel ID, which references the Pixel ID as "C5JIA7C6J7TSRVQDPI20".

---

[20] *Id.*

[21] *See Troubleshoot with Pixel Helper*, TikTok, https://ads.tiktok.com/help/article/tiktok-pixel-helper-2.0?lang=en (last visited Feb. 17, 2026) (noting that a missing or invalid Pixel ID will cause errors when using the TikTok Pixel).

60.     TikTok Pixel users make use of events to collect even more specific data on users' activities, including for the actions taken on a webpage (e.g., clicking a specific button or element, adding an item to a cart, and when a webpage with a URL containing a specified keyword is loaded onto a user's browser), the value of the purchase, and the product purchased.[22]

61.     These event-triggers cause data to be sent as communications are received by users (through webpage loading events), and as communications are sent to the Website (through button clicking and similar events).

62.     The TikTok Pixel also collects:

   a.     The time Website actions took place;

   b.     The IP address (which is used to determine the geographic location of a user);

   c.     Device information, including make, model, operating system, and browser information;

   d.     Cookies that can be used to identify users; and

   e.     Metadata and button clicks.[23]

63.     The information the TikTok Pixel collects provides Defendant and TikTok with a better understanding of who Defendant's customers are, which webpages users have visited, and how they interact with the Website.

---

[22] *How to Set Up Events and Parameters with Events Builder*, TIKTOK, https://ads.tiktok.com/help/article/how-to-set-up-events-and-parameters (last visited Feb. 17, 2026) (describing how to designate events).

[23] *About TikTok Pixel*, TIKTOK, https://ads.tiktok.com/help/article/tiktok-pixel (last visited Feb. 17, 2026).

64.     TikTok's "Advanced Matching" feature allows Defendant to "match customer information such as email and phone number along with actions people take on [the Website]."[24] Once Advanced Matching is active, the TikTok Pixel "will automatically find customer information and match it with people on TikTok."[25] TikTok then provides Defendant with custom audiences based on website user events, like page views or purchases, to model lookalike audiences.[26] Lookalike audiences allow Defendant to retarget users who have already visited or made purchases on the Website and serve them relevant ads on TikTok based on their interactions with the Website.[27]

65.     Put simply, the TikTok Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data TikTok has acquired and accumulated about hundreds of millions of Americans to identify users and develop its marketing profiles, improving Defendant's conversion rates and reducing overall advertising costs.[28]

66.     Defendant used the TikTok Pixel to monitor and log, in real time from users' browsers, when users clicked on specific products, loaded webpages, added specific products to cart, and proceeded through the checkout process to payment and shipping.

---

[24] *About Advanced Matching for Web*, TIKTOK, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Feb. 17, 2026).

[25] *How to set up Automatic Advanced Matching*, TIKTOK, https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en (last visited Feb. 17, 2026).

[26] *Get started with the TikTok Pixel: a small business guide*, TIKTOK (Sept. 6, 2024) https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (last visited Feb. 17, 2026) (benefits of using the TikTok Pixel).

[27] *See* Lizzie Davey*, How to use TikTok Pixel: TikTok conversions tracking*, LEADSBRIDGE (May 2, 2025) https://leadsbridge.com/blog/tiktok-pixel/ (last visited Feb. 17, 2026).

[28] *Id.*

67.    The TikTok Pixel also captures users' identifying cookies (the _ttp cookie is used to identify TikTok users[29]), which can still be de-anonymized through the use of a tool called a "reverse lookup table."[30]

68.    Plaintiff had a reasonable expectation that the following information would not be exposed to the Tracking Tools placed by Defendant: (i) Plaintiff's identifying information, (ii) information that designated Plaintiff as interested in Defendant's academic programs, admissions opportunities, student resources, or institutional offerings, and (iii) IP address and identifier information relating to who Plaintiff is, and who Plaintiff was communicating with to obtain the products.

69.    Using the TikTok Pixel benefits Defendant by allowing Defendant to effectively track conversions, optimize the delivery of its ad campaigns, create and target its own custom audiences, and create and access vast amounts of data to run successful ad campaigns.[31]

70.    TikTok benefits, in turn, by using data collected by the TikTok Pixel to improve its own products and services, including the sale of targeted advertising, and to generate its own benchmarking reports to share with other TikTok business customers.[32]

---

[29]    *See G-Star Raw: List of Cookies,* G-STAR RAW, https://assets.g-star.com/v1/static/Cookielist_Jun_2022#:~:text=Tiktok%20tta_attr_id.%2012%20months%20This%20cookie%20is,measure%20how%20different%20campaigns%20and%20marketing%20strategies (last visited Feb. 17, 2026).

[30]    *Can someone please explain reverse look up tables?*, SOFTWARE ENGINEERING, https://softwareengineering.stackexchange.com/questions/277152/can-someone-please-explain-reverse-look-up-tables (last visited Feb. 17, 2026).

[31]    *See Benefits of using the TikTok Pixel*, TIKTOK (Sept. 6, 2024) https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel?acq_banner_version=73412989 (last visited Feb. 17, 2026).

[32]    *TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024) http://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Dec. 22, 2025).

71. In fact, TikTok admits that it gathers Website visitors' Sensitive Information via the TikTok Pixel and shares that Sensitive Information with third or fourth parties,[33] just as Plaintiff's Sensitive Information was gathered and shared here.

72. According to a leading data security firm, the TikTok Pixel secretly installed on Defendant's Website is particularly invasive. The TikTok Pixel "immediately links to data harvesting platforms that pick off usernames and passwords, credit card and banking information, and details about users' personal health."[34] The TikTok Pixel also collects "names, passwords and authentication codes" and "transfer[s] the data to locations around the globe," and does so "before users have a chance to accept cookies or otherwise grant consent."[35]

73. An image of the invasive TikTok code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to TikTok to add to its collection of user behavior:



*Figure 9 – Home page of the Website*

---

[33] *See Privacy Policy*, TIKTOK (Feb. 5, 2026) https://www.tiktok.com/legal/page/us/privacy-policy/en (last visited Feb. 26, 2026).

[34] Aaron Katersky, *TikTok Has Your Data Even If You've Never Used The App: Report*, ABC NEWS (Mar. 16, 2023 1:59 PM) https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249 (last visited Feb. 17, 2026).

[35] *Id.*



*Figure 10 – Using a browser's "developer tools" while visiting Defendant's webpage confirms the Website loading TikTok Pixel's code onto the user's browser, which caused the transmission of an HTTP Request to TikTok's servers.*



*Figure 11 – Defendant's TikTok Pixel code on the Website displaying the active features of the TikTok Pixel on the Website, including Advanced Matching and AutoAdvancedMatching*

74.    The TikTok Pixel instantly sends communications to TikTok when a user views the page and tracks page interactions. The screenshots below show the sample webpage along with the webpage code, including the various TikTok scripts Defendant causes to run on users' browsers, and the electronic impulses sent to TikTok from users' browsers to aid TikTok's building of marketing profiles on users:







*Figure 12 – Information collected via the TikTok Pixel when a user visits the sample webpage*

75.     To use the TikTok Pixel, Defendant agreed to TikTok's Business Products (Data) Terms (the "TikTok Terms"). But Plaintiff and other Website visitors are never exposed to these terms (nor would they have any reason to look for them) as they form the agreement between Defendant and TikTok, which agreement is not even known to Plaintiff and Website visitors

76.     The TikTok Terms inform website owners using TikTok Pixel that their use of the TikTok Pixel shares or enables TikTok to access their website users' contact details, developer data, and/or event data.[36]

77.     The TikTok Terms are transparent that TikTok will process users' data to match contact details against corresponding accounts and subsequently match those accounts with the users' corresponding event data.[37]

78.     TikTok puts TikTok Pixel users, such as Defendant, on notice that they "must only share with us or enable us to access Business Products Data in a manner that is transparent and lawful."[38] TikTok makes clear that the onus is on the Defendant to provide all necessary transparency notices and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with TikTok.

79.     TikTok educates and reminds TikTok Pixel users of their obligation not to share any data "from or about Children or that includes health or financial information, or other categories of sensitive information."[39]

80.     As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the TikTok Pixel and ignored TikTok's warnings to safely handle its users' data and warn their users that the Website would disclose their information in a manner that threatened their private information.

---

[36] *TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), (last visited Dec. 22, 2025).
[37] *Id.*
[38] *Id.*
[39] *Id.*

**B.      Google Tracking Tools**

**1.      Google Ads**

81.      Google Ads, formerly AdWords, is an advertising platform developed by Google that allows advertisers to bid to display advertisements, service offerings, product listings, or videos to web users.[40]

82.      The process for advertisers using Google Ads to display ads within Google search results is as follows: (i) advertisers create text-based ads with a title, description, and a link to the website to place within the Google search results; (ii) advertisers then choose keywords, usually related to their business or target audience, intended to trigger their ads to appear within the user's search results;[41] (iii) Google then allows advertisers to bid on those various keywords;[42] (iv) the advertiser with the highest bid wins the auction, and the ad is displayed on the search results page; and (v) the winning ad appears above or below the organic search results and is marked as an ad.

83.      Google AdSense works in conjunction with the Google Ads bidding system and allows website owners, like Defendant, to display Google Ads on their websites and earn a revenue share when ads are viewed or clicked.[43] The search terms bid on through Google Ads are used by website owners participating in Google AdSense, allowing those owners to share in advertising revenue generated by Google.

---

[40]*Achieve all your ad goals in one place*, GOOGLE ADS, https://ads.google.com/home/goals/ (last visited May 7, 2026).

[41]      *Reach   the   right   people   with   Search   ads*,   GOOGLE   ADS, https://ads.google.com/home/campaigns/search-ads/ (last visited May 7, 2026).

[42] *Id.*

[43] *Home*, GOOGLE ADSENSE, https://adsense.google.com/start/ (last visited Jan 6, 2026).

84.     AdSense for content or AdSense for search are methods by which AdSense functions.[44] In either configuration, AdSense matches advertisements to website users based on website content and user activity.

85.     Google Ads intercepted Plaintiff's search activity, as depicted below, using a sample search for "blue figure" on the Website. This interception occurred through users' browsers, similar to the Meta Pixel, as communications were sent and/or received on users' devices.



---

[44]     *AdSense    revenue    share*,    GOOGLE    ADSENSE    HELP, https://support.google.com/adsense/answer/180195?hl=en (last visited Jan. 7, 2026).









*Figure 13 – Test search made on the Website resulted in sharing Content Views with Google Page Ads*

86.    Google benefits when website owners utilize Google Ads and Google AdSense in connection with their websites.

87.    Through Google AdSense, Google aggregates viewing data collected from website users. Google uses that data to improve its services and deliver more relevant search results. By analyzing patterns and trends in user behavior, Google gains insight into what users view and what they are interested in. That insight supports service improvements, product development, and revenue growth.

88.    Google's collection and analysis of page views also allows it to improve its machine learning algorithms.[45] Google uses data on how users interact with websites to train its algorithms to deliver more accurate, relevant search results.[46] For example, when a user clicks on a particular link and spends more time on that page, Google treats that interaction as a signal of relevance to that user's interests. By aggregating such data across users, Google can develop advertising profiles that include demographic and interest-based attributes, such as age range, industry, and interests.[47]

89.    Google profits in several ways from the Website's use of the Google AdSense: (i) advertisers bid and pay Google for the keywords that will result in their ads showing in search results; (ii) through AdSense, every time a user clicks or views an ad (depending on their chosen method), the advertiser will pay Google for that click or view; (iii) and Google's ability to aggregate user viewing data allows Google to further tailor its products to advertisers and users by training its algorithms on large volumes of data.

---

[45] Elle Poole Sidell, *What Does Google Do With Your Data?*, AVAST (Dec. 18, 2020) https://www.avast.com/c-how-google-uses-your-data (last visited May 7, 2026).

[46] *Id.*

[47] *Id.*

### 2.    Google Analytics

90.    Like the Meta Pixel, Google Analytics ("GA") collects data about user interactions with a website. That data includes link clicks, button clicks, form submissions, conversions, shopping cart abandonment, items added to or removed from carts, file downloads, scrolling behavior, video views, call-to-action performance, table-of-contents clicks, and other customizable events.[48]

91.    GA transmits collected interaction data to Google, which associates the activity with the website that generated it.[49] Notably, Google notifies web developers that developers should provide "visitors with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[50]

92.    GA functions through specific collection settings and fixed data transmission paths. Google acknowledges the legal implications of those practices and assigns responsibility for user disclosure to website developers, including Defendant.

93.    Here, Defendant added GA to the Website. That implementation caused Plaintiff's webpage views to be intercepted and transmitted to Google, as shown by the example taken directly from the Website below:

---

[48] Zach Paruch, *What Is Google Tag Manager & How Does It Work?*, SEMRUSH BLOG (Jan. 4, 2024) https://www.semrush.com/blog/beginners-guide-to-google-tag-manager/ (last visited May 7, 2026).

[49]    *About    the    Google    tag*,    GOOGLE, https://support.google.com/tagmanager/answer/11994839?hl=en (last visited May 7, 2026).

[50] *Id.*



Grinnell College is proud to announce that 15 faculty members have received promotions and/or been awarded tenure this spring, reflecting the excellence and dedication of Grinnell's faculty, and their commitment to teaching.



36







*Figure 14 - Users' communications with the Website being captured by Google Analytics*

94.     After the data reaches those common destinations, Google products analyze the information and provide feedback that allows Defendant to monetize the collected data through targeted advertising.

95.     These Tracking Tools continue to intercept users' communications with the Website even when a user chooses to allow only strictly necessary cookies and to stop the sale and sharing of their personal information with third parties.

### C.     The Meta Pixel

96.     Meta offers its own tracking pixel (the "Meta Pixel") to website owners for the purpose of monitoring user interactions on their websites, which can then be shared with Meta.

97.     The Meta Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook account to its Pixel, then add code to the website to use the Pixel.[51]

98.     When a Pixel is created, a Pixel ID (also called a DataSet ID by Meta) is generated.[52] This Pixel ID is used to initialize the Meta Pixel, either by allowing Meta to fetch a predetermined library of code associated with that ID or by identifying the website owner's Facebook account used to receive the collected data when programming the Pixel directly into a website.[53]

---

[51]     *Setup and install the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited May 7, 2026).
[52] *Id.*
[53] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited May 7, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

99.     This Pixel ID must match "a known Pixel ID" in Meta's system,[54] and is transmitted by the Meta Pixel.[55]

100.     As Meta notes, the Meta Pixel must be added to each individual page that a website owner wishes to be tracked.[56]

101.     The Meta Pixel is employed by Defendant to gather, intercept, and then share user information with Meta.[57] Receiving this information enables Meta and Defendant to build valuable personal profiles for Website users to inform their targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[58]

102.     The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location, and finding the people who are most likely to take action and view content.[59]

103.     Once implemented on a website, the Meta Pixel begins sharing users' information the moment a user lands on the site.

---

[54]     *Meta Pixel Helper*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/support/pixel-helper (last visited May 7, 2026)

[55] *Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited May 7, 2026).

[56] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited May 7, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[57] The Meta Pixel allows websites to track user activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited May 7, 2026).

[58] *Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited May 7, 2026).

[59] *Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited May 7, 2026).

104.    When a Facebook account holder logs onto Facebook, tracking cookies, including the c_user cookie, the data cookie, and the fr cookie, are automatically created and stored on the user's device.[60] These cookies allow Meta to link the data it receives through the Meta Pixel to individual Facebook account holders.

105.    The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.

*Figure 15 – Sample c_visitor cookie, containing FID of test account created by Plaintiff's counsel to investigate the Meta Pixel*

106.    A simple search for "what is a c_user cookie" leads one to learn that the string of numbers is the FID of the user, demonstrating that even non-technical internet users can, without specialized knowledge, discover and apply an FID to locate a given Facebook profile.

---

[60] *Cookies Policy: What are cookies, and what does this* policy cover?, FACEBOOK (Dec. 12, 2023) https://www.facebook.com/policy/cookies/ (last visited May 7, 2026).



*Figure 16 – Google AI answer to search for "what is the c_user cookie"*

107.    A subsequent Google search for "Facebook user ID" reveals that the URL of a Facebook profile is facebook.com followed by the FID.



*Figure 17 – Google AI answer to search for "Facebook user ID"*

108.    Even simpler, with the rise in General Artificial Intelligence agents such as ChatGPT, anyone with an internet connection can use tools to decipher computer code, as demonstrated below.

Cookie      datr=SRe2ZwkqD1MICziMOaVSbrBb; sb=axe2Z3ELf4psOiSR5g4mAbnw; ps_n=1; c_user=███████████ fr=1pt1CrZUb5GCIKrsE.AWf9w0OWi6U7vLypxV2ASHrQbvGC1HbHs4N2zS9Z_yAtcwFYg hs.BoONEO..AAA.0.0.BoONEO.AWePM8vKPdJ0voFcIFNQPsmTNsU; xs=16%3A2Jkg3ou-pgMbfQ%3A2%3A1739986850%3A-1%3A-1%3A%3AAcU9K7MEQI5AH9t7NzLyUbCqy-P5BBoaBeHEfV2AVYo; ar_debug=1

*Figure 18 – Screenshot from a browser's developer tools of cookies transmitted from a Pixel transmission (c_user redacted)*



Identify the person who watched the video

The cookie header you've provided includes this key-value pair:

ini                       Copy   Edit

c_user=███████████

This is a **Facebook user ID** that corresponds to the person who was **logged into Facebook** in the browser session when the video was accessed.

## Can this ID identify the person?

- **Yes, but only within Facebook's system.**
  The `c_user` value (███████████) is a unique Facebook user ID tied to an account. If **you control this browser session** (e.g., it's your own), you could:

  - Paste this URL into your browser:
    `https://www.facebook.com/`███████████
  - It will redirect to the associated profile (if it exists and hasn't been deleted or made private).

*Figure 19 – Screenshot from ChatGPT response to query "Identify the person who watched the video" with screenshot of cookies from Figure 18 (c_user redacted)*

109. The FID can simply be appended to www.facebook.com/ to navigate to the visitor's profile (e.g., www.facebook.com/[FID]). Using the FID from *Figure 15*, appending it to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) will redirect the webpage straight to the Facebook profile associated with the FID, as depicted below:

43



*Figure 20 – Sample Facebook account created by Plaintiff's counsel to investigate the Meta Pixel, with FID highlighted in URL*

110.    The Meta Pixel tracks user activity on web pages by monitoring events, which, when triggered, cause the Meta Pixel to automatically send data – here, users' Sensitive Information – directly to Meta.[61] Examples of events utilized by websites include (i)when a user loads a page with a Pixel installed (the "PageView event"); and (ii) when a user clicks on a button on the Website (the "SubscribedButtonClick" event).[62] The Website utilizes both these events.[63]

---

[61] *Id.*

[62]    *Specifications    for    Meta    Pixel    standard    events*,    FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142    (last visited May 7, 2026).

[63] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel    Helper    tool.    *See    About    the    Meta    Pixel    Helper*,    FACEBOOK,

111.    Defendant's use of the Meta Pixel also transmits its unique Pixel IDs via the "id" parameter, which contains Defendant's Pixel IDs of "182574768772837" and "1844171269168179".

112.    Defendant and Meta use the Meta Pixel to monetize Website users' Sensitive Information.

113.    Meta independently benefits from data collected through the Meta Pixel by using it to sell targeted advertising services. By using users' Sensitive Information, Meta refines its marketing algorithms, profiting from the ability to more accurately target potential customers. Defendant then uses Meta's refined marketing profiles to target users with advertising.

114.    Defendant's concealed use of the Meta Pixel on the Website is demonstrated by the screenshot below, which shows the Pixel events on the Website.

---

https://www.facebook.com/business/help/198406697184603?id=1205376682832142        (last visited May 7, 2026).











*Figure 21 – Meta Pixel tracking a user through the "PageView" and "SubscribedButtonClick" events*

115.    When a business applies to use the Meta Pixel, it is provided with details about its functionality, including its handling of private information.[64]

116.    To make use of the Meta Pixel, Defendant agreed to Meta's Business Tool Terms (the "Meta Terms").

117.    The Meta Terms inform website owners using Meta's Pixel that the employment of the Meta Pixel will result in data sharing, including with Meta, through the automatic sharing of Pixel Event information and contact information.[65]

118.    The Meta Terms are transparent that Meta will use the Pixel Event information and contact information "to match the contact information against visitor IDs, as well as to combine those visitor IDs with corresponding [Pixel Event information]."[66]

119.    Meta directs parties implementing the Meta Pixel, such as Defendant, to encrypt request information[67] before data can be shared.[68]

120.    Meta further provides Meta Pixel users, such as Defendant, guidance on responsible data handling and details how data is acquired, used, and stored, including which information is shared with Meta.

---

[64] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started (last visited May 7, 2026). (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook Visitor accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data . . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").

[65] *Meta Business Tools Terms*, FACEBOOK (Nov. 3, 2025), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGo dnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited May 7, 2026).

[66] *Id.*

[67] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Meta Pixel method, which makes users' information visible. *See id.*

[68] *Id.*

121.    Meta educates or reminds Meta Pixel users, such as Defendant, of their responsibility to inform their users about their website's data-sharing practices and specifically guides website owners to obtain the requisite rights, permissions, or consents before sharing information with any Tracking Entities.[69]

122.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Meta Pixel and ignored Meta's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' Sensitive Information.

### D.    The Reddit Pixel

123.    Additionally, Defendant has installed a tracking pixel on its Website created by social media platform Reddit (the "Reddit Pixel").

The Reddit Pixel is a piece of code that a website owner can add to their site to allow Reddit to track users on the site and record the actions visitors take in their browsers.[70] The harvested data is subsequently used by Reddit and the website owner to serve targeted ads to Reddit users.

124.    The Reddit Pixel is also used in conjunction with Reddit's Conversion API (CAPI) to track specific actions that users take on the websites, such as viewing a page, submitting a search in the website's search bar, adding a product to the visitor's cart, checking out, and other

---

[69] *Best practices for privacy and data use for Meta Business Tools*, FACEBOOK, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited May 7, 2026).

[70] *About the Reddit Pixel*, REDDIT, https://business.reddithelp.com/s/article/reddit-pixel (last visited Feb. 17, 2026); *Install the Reddit Pixel Directly*, REDDIT, https://business.reddithelp.com/s/article/Install-the-Reddit-Pixel-on-your-website (last visited Feb. 17, 2026).

specified events.[71] Because the Reddit CAPI operates on website servers, users cannot verify its use.

125.   Reddit makes use of a website owner's pixel ID to determine which data should be tracked when sending the code for the Pixel to the user's browser,[72] and to specify "which business account should receive" the user's tracking data.[73]

126.   Reddit admits that it shares users' Sensitive Information with third and fourth parties,[74] just as Plaintiff's Sensitive Information was shared here.

127.   In Defendant's use of the Reddit Pixel, Defendant configured the Reddit Pixel to include a parameter called "id" which identifies Defendant's Reddit Pixel ID as "a2_drcpko70zyya". This data is sent both when the Website receives communications and when users send communications to the Website.

128.   Website owners, like Defendant, can enable a feature of the Reddit Pixel called "Auto-Advanced Matching" to determine the exact identities of Reddit users who visit the website.

129.   Auto-Advanced Matching automatically scrapes a website for any email addresses a user types or pastes and sends that email information to Reddit.[75]

---

[71] *Conversion Events*, REDDIT, https://business.reddithelp.com/articles/Knowledge/supported-conversion-events (last visited Feb. 17, 2026).

[72] *See Install the Reddit Pixel Directly*, REDDIT, https://business.reddithelp.com/s/article/Install-the-Reddit-Pixel-on-your-website (last visited Feb. 17, 2026).

[73] *About the Reddit Pixel*, REDDIT, https://business.reddithelp.com/s/article/reddit-pixel (last visited Feb. 17, 2026).

[74] Reddit Privacy Policy, REDDIT (Jan. 6, 2026) https://www.reddit.com/policies/privacy-policy (last visited Feb. 26, 2026).

[75] *Auto-Advanced Matching*, REDDIT, https://business.reddithelp.com/s/article/automated-advanced-matching (last visited Feb. 17, 2026).

130.    In addition to email addresses, a website owner can enable the Reddit Pixel and the CAPI to send additional personal information to Reddit, known as "match keys," to identify website users.[76]

131.    IP addresses are match keys that website owners are *required* to send to Reddit. Website owners and Reddit may also use other match keys, including:

a.    Email addresses;

b.    Phone numbers;

c.    Mobile Advertising IDs (a unique identifier for a mobile user);

d.    Reddit Click IDs (to attribute click conversions more accurately);

e.    External IDs (an advertiser-assigned identifier that enhances match accuracy);

f.    Reddit UUIDs (a unique ID generated by the Reddit Pixel);

g.    User Agents (which identify the software the user is using to access the website); and

h.    The visitor's screen dimensions.[77]

132.    This data can be used by Reddit to match an otherwise anonymous website visitor to their Reddit account, or even to identify them outright, associating their identity with their activity on the website.

---

[76] *About Match Keys*, REDDIT, https://business.reddithelp.com/s/article/about-match-keys#customer-match-keys-and-identifiers (last visited Feb. 17, 2026).
[77] *Id.*

133.    Reddit uses this data to help advertisers, including Defendant, gauge the effectiveness of their ad campaigns, improve their ability to attribute activity to specific campaigns, track users across devices, and create more precisely targeted campaigns.[78]

134.    Additionally, Reddit uses this data to optimize its ad placements and develop new services.[79]

135.    Defendant's use of the Reddit Pixel on the Website is demonstrated by the screenshots below, which follow a user's interaction with admissions-related and informational content on the Website.



*Figure 22 – Reddit Pixel tracking a user visiting a webpage through the "PageVisit" event*

136.    To utilize the Reddit Pixel, Defendant agreed to Reddit's Business Tool Terms (the "Reddit Terms").

137.    The Reddit Terms inform website owners, such as Defendant, that using the Reddit Pixel will result in Reddit obtaining users' data, including users' website actions, email addresses, cookie IDs, and device IDs, among other "matching parameters."[80]

---

[78] *Id.*

[79]    *Reddit Privacy Policy*, REDDIT (last revised Jan. 6, 2026) https://www.reddit.com/policies/privacy-policy#policy-h2-4 (last visited Feb. 17, 2026).

[80]    *Reddit Business Tool Terms*, REDDIT (last revised July 7, 2025) https://business.reddithelp.com/s/article/Reddit-Business-Tool-Terms (last visited Feb. 17, 2026).

138.    The Reddit Terms make clear that the onus is on the Defendant to provide all necessary transparency notices and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with Reddit.

139.    The Reddit Terms explicitly condition the use of the Reddit Pixel on website owners' warranties that they: (i) provide "prominent and legally-sufficient notice" of the Reddit Pixel's data sharing to users; (ii) provide "clear, prominent and legally sufficient instructions regarding how to opt out of data collection and use of such data collection and use;" and (iii) do not share "any data related to users who have not provided consent[.]"[81]

140.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Reddit Pixel and ignored Reddit's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

### E.    The Snap Pixel

141.    Defendant also installed code on the Website created by Snapchat that tracks Website visitors' actions, behavior, and conversions across the Website (the "Snap Pixel").

142.    To make use of the Snap Pixel, Defendant must create a Snapchat Ads manager account, create a pixel, receive a Pixel ID, select the information to be collected, follow specific guides for integration with third-party software like Spotify or Google Tag Manager, and determine whether to enable automated matching for the Snap Pixel.[82]

---

[81] *Id.*

[82]    *Getting    Started    with    Enabling    the    Pixel*,    SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-website-install?language=en_US&r=692&ui-knowledge-components-aura-

143.    The Snap Pixel is a piece of JavaScript code provided by Snapchat that allows advertisers, such as Defendant, to track user actions and behavior on websites for the purpose of measuring ad performance, optimizing ad campaigns, and building targeted audiences for better advertising results.[83]

144.    "For the Pixel to work, [Snapchat] must receive a Pixel ID and a standard event type[,]" at a minimum.[84]

145.    The Pixel ID is an "[a]dvertiser specific ID . . ."[85] where the Pixel ID is used to initialize the Snap Pixel's tracking,[86] identifying which advertising account receives the collected data.

146.    This software may be automatically or manually added to a website's webpages, but in either case, the software must be added to each webpage being tracked.[87]

---

actions.KnowledgeArticleVersionCreateDraftFromOnlineAction.createDraftFromOnlineArticle=1 (last visited Dec. 22, 2025).

[83] *Using the Snap Pixel*, SNAPCHAT (July 11, 2023) https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it (last visited Dec. 22, 2025); *see also Snapchat Pixels*, SPRINKLR, https://www.sprinklr.com/help/articles/snapchat-pixel/snapchat-pixels/640739d87517d84a3aaf2d26 (last visited Oct. 9, 2025); Marialuisa Aldeghi, *How to set up the Snap Pixel: A step-by-step guide*, LEADSBRIDGE (Dec. 18, 2024) https://leadsbridge.com/blog/snap-pixel/ (last visited Dec. 22, 2025).

[84] Snap Pixel FAQ, SNAPCHAT, https://businesshelp.snapchat.com/s/article/snap-pixel-faq?language=en_US (last visited Dec. 22, 2025).

[85] *Snap Pixel Helper Glossary*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-helper-glossary?language=en_US (last visited Dec. 22, 2025).

[86] *See About Snap Pixel*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/snap-pixel-about?language=en_US (last visited Dec. 22, 2025).

[87] *Directly Implement the Pixel On Your Website*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US (last visited Dec. 22, 2025).

147.    Key features of the Snap Pixel include tracking user actions ("events") designated by advertisers, such as page views, add-to-cart actions, purchases, and sign-ups.[88] Advertisers, such as Defendant, can add additional parameters to these events to obtain more granular insights, such as purchase value or product type information.[89] The information is collected immediately as users land on the website where the pixel is installed. [90]

148.    The Snap Pixel also enables cross-device tracking, providing a comprehensive view of a customer's journey across multiple devices.[91]

149.    The Snap Pixel collects: the time the website actions occurred;[92] device information such as the hardware model, operating system, and browser type used;[93] cookies;[94] metadata such as button clicks, time spent on the site, conversations, and page visits;[95] and IP addresses for general geographic data.[96]

---

[88]        *Pixel      Event      Examples*,          SNAPCHAT, https://businesshelp.snapchat.com/s/topic/0TO8b000000P8xxGAC/pixel-event-examples?language=en_US (last visited Dec. 22, 2025).

[89]        *Additional        Parameters        Example*,          SNAPCHAT, https://businesshelp.snapchat.com/s/article/additional-parameters?language=en_US (last visited Dec. 22, 2025).

[90] *Using the Snap Pixel*, SNAPCHAT (July 11, 2023) https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it (last visited Dec. 22, 2025); *see also* Marialuisa Aldeghi, *How to set up the Snap Pixel: A step-by-step guide*, LEADSBRIDGE (Dec. 18, 2024), https://leadsbridge.com/blog/snap-pixel/ (last visited Dec. 22, 2025).

[91]    *About Snap Pixel*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/snap-pixel-about?language=en_US#:~:text=The%20Snap%20Pixel%20is%20a,to%20manage%20your%20privacy%20settings (last visited Dec. 22, 2025).

[92]        *Snap      Pixel:      Power      Your      Ad      Performance*,          SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel (last visited Dec. 22, 2025).

[93] *Privacy Policy*, SNAP (Apr. 21, 2025) https://values.snap.com/privacy/privacy-policy (last visited Dec. 22, 2025).

[94] *Cookie information*, SNAP (Apr. 8, 2025) https://www.snap.com/privacy/cookie-information (last visited Dec. 22, 2025).

[95] Ate Keurentjes, *How do you install the Snap Pixel via Google Tag Manager*, TAGGRS (Oct. 23, 2025) https://taggrs.io/en/snap-pixel/ (last visited Dec. 22, 2025).

[96]        *Directly    Implement    the    Pixel    On    Your    Website*,          SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US    (last

150.    The Snap Pixel enables website owners, such as Defendant, to understand how users navigate to their sites. This data helps Defendant refine its advertising strategies by identifying high-performing campaigns and optimizing ad spending.[97]

151.    The Website's Snap initialization code and Pixel event activations transmit Defendant's Pixel ID in the form of a URL parameter named "pid", which contains Defendant's Snap Pixel ID value of "8083271d-52f6-4dee-b0ed-6cfaf5b4f97e". This data is sent both when the Website receives communications and when users send communications to the Website.

152.    The information the Snap Pixel collects provides Defendant with a better understanding of who its customers are and how they navigate around the Website.

153.    Snap also benefits from non-customer-list audience information independently.[98]

154.    The harvested data collected by the Snap Pixel is used by Defendant to create custom audiences.[99] Defendant can retarget users who viewed specific pages or made purchases and build lookalike audiences to reach new users with similar characteristics.[100]

155.    Put simply, the Snap Pixel collects as much data as possible about otherwise anonymous visitors to the Website and matches it with existing data that Snapchat has acquired and accumulated about millions of Americans to improve Defendant's conversion rates and reduce overall advertising costs.

---

visited Dec. 22, 2025); *see also Privacy Policy*, SNAP (Apr. 21, 2025), https://values.snap.com/privacy/privacy-policy (last visited Dec. 22, 2025); *Data Processing Agreement*, SNAP (July 25, 2025) https://www.snap.com/terms/data-processing-agreement (last visited Dec. 22, 2025).

[97] Aldeghi, *supra* note 2.

[98] *See Privacy Policy*, *Section 2(g),* SNAP (Apr. 21, 2025) https://values.snap.com/privacy/privacy-policy (last visited Dec. 22, 2025).

[99] Aldeghi, *supra* note 2.

[100] *Id.*

156.    Snap Pixel requires advertisers, such as Defendant, to integrate code into its website's header or use tools like Google Tag Manager for a seamless setup.[101] Advertisers, such as Defendant, are encouraged to use tools like Snap Pixel Helper to verify proper installation, ensure accurate event tracking, and track user activity.[102]

157.    Defendant, through the Snap Pixel, uses data and cookies to track users and serve them relevant ads on Snapchat based on how they interacted with the Website.[103] The data received from Snapchat conversion tracking allows Defendant to serve highly targeted ad campaigns to the right people.[104]

158.    Using Snap Pixel helps Defendant collect important information about the people who buy from it, so that Defendant, in turn, can benefit. Here are some of the biggest benefits:

1.    **Measure conversion events that matter**: See all the actions users take on the Website, across all devices, and attribute conversions back to ad campaigns.

2.    **Reach the perfect audience**: Defendant can create custom audiences and lookalike audiences based on the specific actions users have taken on the Website.

3.    **Optimize advertising campaigns**: Use real-time insights to optimize delivery of Defendant's campaigns for more effective results.[105]

---

[101] *Id.*

[102]    *Snap Pixel: Power Your Ad Performance*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel (last visited May 13, 2026).

[103] *Id.*

[104] *Id.*

[105]    *Benefits of Using the Snap Pixel*, SNAPCHAT, (July 11, 2023) https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it (last visited May 13, 2026).

159. An image of the invasive Snap Pixel code secretly embedded on Defendant's Website can be seen here:





*Figure 23 - Snap Pixel active on the Website*

160.    When the Snap Pixel triggers, it captures the relevant data and sends a transmission

to Snapchat's servers, as depicted in the picture above, which shows Defendant's Snap Pixel

instantly sending communications to Snapchat as users take certain actions on the Website, like viewing a page.

161. The Snap Pixel's functionality is not disclosed on the Website.

162. By using the Snap Pixel and providing Snapchat with users' information, Defendant had to agree to Snapchat's Personal Data Terms (the "Snap Terms"), among other agreements governing the use of the Snap Pixel.

163. By agreeing to the Snap Terms, Defendant represented and warranted that the personal data it shares with Snapchat will not contain any information about individuals under the age of 13 or any sensitive information or special category data.[106]

164. The Snap Terms further require Snap Pixel users, such as Defendant, of its responsibility to secure and maintain "all necessary rights, licenses and consents required to provide or make available the personal data" shared through the Snap Pixel.[107]

165. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from the use of the Snap Pixel and ignored Snapchat's warnings to safely handle its users' data and to warn its users that the Website would disclose their information in a manner that threatens their private information.

---

[106] *Personal Data Terms*, SNAP (June 30, 2025) https://www.snap.com/terms/personal-data#:~:text=In%20summary%3A%20you%20provide%20a,information%3B%20you%20obtained%20any%20necessary (last visited May 13, 2026).
[107] *Id.*

## V. Defendant Violated the Federal Wiretap Act

166. The federal Wiretap Act prohibits, *inter alia*, the intentional interception[108] of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. 18 U.S.C. § 2511.

167. When used with respect to any wire, oral, or electronic communication, "contents" "includes any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

### A. Tracking Entities Intercepted the Contents of Plaintiff's Communications in Transit

168. Transmitted URLs that include both the path and query string reflect the substance of a user's communication and therefore constitute content.

169. Here, the network requests intercepted by the Tracking Entities included detailed Request URLs containing the names and file locations of webpages, the products users browsed on the Website, identifying information in the form of cookies, and user activity information indicating users' commercial activity and purchases.

170. The Tracking Tools intercepted the contents of Plaintiff's communications contemporaneously with Plaintiff's interactions with the Website. The Tracking Tools began transmitting data to the Tracking Entities as soon as the Tracking Tools loaded onto Plaintiff's browsers, and additionally transmit data at the moment Plaintiff submitted information through the Website.

171. This interception, duplication, and transmission occurred inside Plaintiff's and other users' browsers, before the communications fully reached users' devices, or otherwise

---

[108] "[I]ntercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

before the communications were transmitted from users' devices, and therefore occurred while the communications were in transit.

172.    The Tracking Entities were third parties to Plaintiff's communications with Defendant's Website, and intercepted, read, duplicated, and retransmitted users' data while it was in transit.

173.    Defendant's deployment of the Tracking Tools enabled Tracking Entities to intercept Request URLs that specified the content Plaintiff accessed on the Website, in violation of 18 U.S.C. § 2511(1)(a).

**B.    Defendant Aided and Abetted Third-Party Interceptions**

174.    A party violates 18 U.S.C. § 2511(1)(a) not only by directly intercepting communications, but also by knowingly permitting or facilitating third-party interception.

175.    Defendant knowingly procured the Tracking Entities to embed and configure the Tracking Tools in its Website, in a manner that enabled the Tracking Entities to intercept the contents of Plaintiff's communications with the Website.

176.    18 U.S.C. § 2511(2)(d) requires the prior consent of at least one party to the communication.

177.    Defendant did not obtain Plaintiff's express or implied consent to allow the Tracking Entities to intercept his communications and Sensitive Information, before or after the interceptions occurred, nor could Defendant consent to the interception of those communications, as the scope of its consent was bound to the Terms provided by the Tracking Entities, which required obtaining valid consent from Plaintiff and/or otherwise prohibited the use of the Tracking Tools for intercepting sensitive or legally protected data. Defendant established that the data was sensitive by allowing users to choose whether to disallow its sharing, despite ultimately disregarding that choice.

**C.      Defendant Represented that Users Would Not Be Tracked Without Consent But Tracked Users by Default, Before Seeking Consent**

178.     When users visit Defendant's Website, they are presented with a Cookie Banner that states they can opt in to the use of cookies on the Website.



*Figure 24 – The Cookie Banner shown to users who visit the Website*

179.     However, Plaintiff's investigation revealed that the Website's default settings permitted tracking to begin as soon as users arrived on the Website, before users had an opportunity to provide affirmative consent by clicking "I Agree" on the Cookie Banner. Defendant deployed Tracking Tools by, at a minimum, Facebook, Google, TikTok, Reddit, Snapchat, and other third parties despite the absence of any meaningful consent.

180.     Defendant intentionally placed Google, Meta, TikTok, Reddit, and Snapchat Tracking Tools on the Website and allowed Google, Facebook, TikTok, Reddit, and Snapchat to track users and intercept their communications with the Website, despite stating in the Cookie Banner that the Tracking Tools would not be deployed without users' affirmative consent.

181.     Defendant and the Tracking Entities benefited from the interception of Plaintiff's communications by reading and subsequently using the intercepted contents to construct detailed profiles reflecting Plaintiff's browsing habits and interests, and by using those profiles for targeted advertising.[109]

---

[109] *See About Advanced Matching for Web*, TikTok, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited May 7, 2026); *Meta Pixel*, Facebook, https://www.facebook.com/business/tools/meta-pixel (last visited May 7, 2026); *Enable automatic enhanced match*, Pinterest, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited May 7, 2026).

182. The Tracking Entities independently benefit from the interception of communications, using data collected through the Tracking Tools to improve their advertising products and market those capabilities to other businesses.[110]

**TOLLING**

183. The statutes of limitations applicable to Plaintiff's and the Class Members' claims are tolled by Defendant's wrongful conduct and by Plaintiff's and the Class Members' delayed discovery of their claims. Defendant's acts were intentionally concealed, technically complex, and inherently self-concealing, thereby preventing Plaintiff and the Class Members from discovering the unlawful disclosure of their Sensitive Information until recently.

184. Defendant not only facilitated and enabled the covert incorporation of Tracking Entities' Tracking Tools into its Website, but also, via its Cookie Banner, misrepresented its data sharing practices.

185. Defendant possessed superior and exclusive knowledge that the Tracking Entities' Tracking Tools embedded within its Website would disclose Plaintiff's and Class Members' Sensitive Information.

186. Plaintiff and the Class Members could not, through the exercise of reasonable diligence, have discovered the full scope of Defendant's conduct and misrepresentations because the technology involved is highly technical and not reasonably discernible to ordinary users.

---

[110] *See TikTok Business Products (Data) Terms*, TIKTOK (Jan. 22, 2026) http://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited May 7, 2026); *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023) https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited May 7, 2026).

187.    Plaintiff and the Class Members first became aware of Defendant's misconduct as a result of counsel's investigation and technical analysis conducted in advance of filing this Complaint.

## CLASS ALLEGATIONS

188.    Plaintiff brings these claims for relief, individually and on behalf of the following Class and Subclasses, pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3):

> All natural persons who visited and interacted with Defendant's Website in the United States during the applicable limitations period and whose electronic communications with the Website were intercepted by Tracking Tools and disclosed, shared, or otherwise transmitted to the Tracking Entities (the "Class").

189.    Plaintiff brings this class action individually and on behalf of the following New York Subclass:

> All members of the Class who visited and interacted with Defendant's Website while located in the State of New York during the applicable limitations period (the "New York Subclass").

190.    Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

191.    Plaintiff reserves the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveal that the Class and Subclass should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

192.    NUMEROSITY: At this time, Plaintiff does not know the number of Class Members but believes the number to be at least measured in thousands, if not millions, given the

popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class Members may be ascertained via the records maintained by the Defendant.

193. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between the Class Members, and which may be determined without reference to the individual circumstances of any Class Members, include but are not limited to the following:

    a.    Whether Defendant shared the Class Members' Sensitive Information with the Tracking Entities or other third parties;

    b.    Whether Defendant obtained effective and informed consent to do so;

    c.    Whether the Class Members are entitled to statutory penalties; and

    d.    Whether the Class Members are entitled to injunctive relief.

194. TYPICALITY: As a person who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiff is asserting claims that are typical of the members of the Class.

195. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Classes. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

196. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. It would be unduly burdensome on the courts, where individual litigation of numerous

cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF NEW YORK'S DECEPTIVE ACTS AND PRACTICES ACT
### N.Y. Gen. Bus. Law § 349
### (On Behalf of Plaintiff and the New York Subclass)

197.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 196 as though fully set forth herein.

198.    N.Y. Gen. Bus. Law ("GBL") § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state . . . . "

199.    Defendant conducts consumer-oriented business and trade, including the operation of its Website, in its advertising and sale of goods throughout the country, as required by GBL § 349.

200.    Defendant violated GBL § 349 by deceptively representing, through its Cookie Banner, that users would not be tracked by cookies unless they consented to the placement of cookies by pressing the "I Accept" button.

201.    Defendant's misrepresentations and partial misrepresentations, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein, falsely represented that users were provided a particular level of privacy protection and control over their Sensitive Information, when in fact Defendant continued to collect, disclose, and transmit users' Sensitive Information to Tracking Entities through the Tracking Tools regardless of users' consent.

69

202.   Defendant's misrepresentations and partial misrepresentations, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein, were directed at consumers, including Plaintiff, visiting Defendant's Website, occurred repeatedly in the course of Defendant's online business practices, and were capable of deceiving a substantial portion of the consuming public with respect to the collection and disclosure of their Sensitive Information.

203.   The facts misrepresented, concealed, or not disclosed by Defendant were material in that Plaintiff and the New York Subclass Members, and other reasonable consumers, would have considered them in deciding whether and how to interact with Defendant's Website. Had Plaintiff and members of the New York Subclass known that Defendant continued to collect and disclose their Sensitive Information through tracking technologies regardless of users' cookie consent, they would not have visited the Website, would have limited their interactions with it, or would have taken steps to avoid or block such data collection.

204.   Defendant alone possessed the information that was material to the Plaintiff and the New York Subclass Members and failed to disclose such material information to consumers.

205.   Defendant has engaged and continues to engage in deceptive conduct in violation of GBL § 349.

206.   The misrepresentations and partial misrepresentations, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein, caused Plaintiff and the New York Subclass Members to suffer injury in the form of actual damages, including the loss of control and value of their Sensitive Information and the unauthorized disclosure of Sensitive Information to Tracking Entities, which they would have avoided had Defendant accurately disclosed its data-collection and tracking practices.

207. Defendant intended for Plaintiff and the New York Subclass Members to rely on its misrepresentations and partial misrepresentations, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein, regarding the nature and extent of its data-collection and tracking practices when deciding whether and how to interact with Defendant's Website, while unaware of the undisclosed material facts.

208. GBL § 349 applies to the Plaintiff and the New York Subclass Members because the State of New York has an interest in regulating business conduct in the region. Plaintiff is a resident of New York and was in New York when his Sensitive Information was intercepted and disclosed without his consent.

209. Defendant's conduct has caused and is causing immediate and irreparable injury to Plaintiff and the New York Subclass Members. Defendant's conduct will continue to damage both the Plaintiff and the New York Subclass Members and deceive the public unless enjoined by this Court.

210. As a direct and proximate result of Defendant's violations, Plaintiff, the New York Subclass Members, and other reasonable consumers have been harmed, and that harm will continue unless Defendant is enjoined from continuing to misrepresent and omit the true nature of its data-collection, tracking, and information-sharing practices.

## COUNT II
## VIOLATIONS OF NEW YORK'S FALSE ADVERTISING LAW
### N.Y. Gen. Bus. Law § 350
### (On Behalf of Plaintiff and the New York Subclass)

211. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 196 as though fully set forth herein.

212. GBL § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

213. Pursuant to GBL § 350-a, false advertising is defined as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect . . . [where "misleading" refers to] representations made by statement, word, design, . . . or any combination thereof, but also to the extent to which to which the advertising fails to reveal facts material in the light of such representations . . . ."

214. Defendant knew or should have known that its representations regarding users' ability to control the collection, sale, or sharing of their Sensitive Information were false or misleading because the Tracking Tools continued to collect and disclose users' data through the Website regardless of users' consent.

215. Defendant purposely misrepresented, actively concealed, and failed to disclose material facts regarding its data-collection, tracking, and information-sharing practices to consumers, including Plaintiff and the New York Subclass Members.

216. The facts misrepresented, concealed, or otherwise undisclosed by Defendant were material in that Plaintiff, the New York Subclass Members, and other reasonable consumers would have considered them when deciding whether and how to interact with Defendant's Website. Had Plaintiff and the New York Subclass Members known that Defendant continued to collect and disclose their Sensitive Information through Tracking Tools regardless of users' cookie consent, they would not have visited the Website, would have limited their interactions with it, or would have taken steps to avoid such data collection.

217. Defendant obtained a benefit from Plaintiff and the New York Subclass Members by collecting, using, and disclosing their Sensitive Information through Tracking Entities, while depriving them of the ability to control the use and sharing of that Sensitive Information, despite

the availability of reasonable alternatives that do not engage in the same deceptive data-collection practices.

218.    Defendant's conduct caused Plaintiff and the New York Subclass Members to suffer actual damages by depriving them of the ability to make informed choices about the collection and disclosure of their personal information and by subjecting them to unauthorized tracking and data sharing, which they would have avoided had Defendant accurately disclosed its data-collection practices.

219.    As a direct and proximate result of Defendant's violations of GBL § 350, Plaintiff and the New York Subclass Members have been injured, and that harm will continue unless Defendant is enjoined from continuing to misrepresent and omit the true nature of its data-collection, tracking, and Sensitive Information-sharing practices on the Website.

220.    Defendant's conduct has also substantially injured the public, as consumers across the country were exposed to and relied upon Defendant's representations regarding its data-privacy practices while unaware of material omissions—specifically, the failure to disclose that users' personal information was collected, shared, and disclosed to third parties through tracking technologies regardless of users' cookie consent. Defendant's omissions deprived consumers of the ability to make informed decisions about their online privacy and created a false impression that users' choices meaningfully controlled data collection and sharing, thereby undermining public trust in websites that purport to offer transparency.

221.    Defendant's conduct thus caused real-world harm and poses an ongoing risk of further injury if not enjoined.

222.    Pursuant to GBL § 350-e, the Plaintiff and the Class seek injunctive relief, declaratory relief, actual and punitive damages or $500 (whichever is greater), statutory damages of three times the actual damages (up to $10,000), and attorneys' fees.

**COUNT III**
**VIOLATION OF THE WIRETAP ACT**
**18 U.S.C. §§ 2510, et seq.**
**(On Behalf of Plaintiff and the Class)**

223.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 196 as though fully set forth herein.

224.    Plaintiff brings this cause of action on behalf of himself and all Class Members.

225.    The federal Wiretap Act prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* 18 U.S.C. § 2511.

226.    The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

227.    The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

228.    The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

229.    The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

230. The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

231. Defendant is a "person" within the meaning of the Wiretap Act.

232. The Tracking Tools embedded on Defendant's Website constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

233. Plaintiff had a reasonable expectation of privacy in his electronic communications with Defendant's Website, including the pages he viewed, searches conducted via the Website, browsing activity, and other interactions with Website features, particularly where Defendant represented through its Cookie Banner that users needed to opt in to the use of cookies for tracking.

234. An objectively reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting users' choices, intent, and behavior on commercial websites, such as searches, browsing, and order interactions, are sensitive and convey the substance and meaning of the communication, i.e., Sensitive Information.

235. A reasonable user is entitled to assume that any disclosure of the contents of their communications occurs lawfully and with consent. To hold otherwise would require users to assume their privacy will be violated as a matter of course.

236. Plaintiff reasonably expected that the Tracking Entities were not intercepting, recording, or using the contents of his electronic communications with Defendant's Website without his consent.

237. Within the relevant time period, Plaintiff's electronic communications with the Website were intercepted contemporaneously at the moment they were sent by the Tracking Tools

and transmitted to Tracking Entities without Plaintiff's consent, for the unlawful purpose of monetizing the Plaintiff's intercepted information, including for combining that information with information collected about Plaintiff from across the internet and used for advertising, analytics, and marketing optimization.

238. Interception occurred whenever Plaintiff interacted with the Website, including when he navigated to webpages, used search features, or otherwise communicated information to the Website through his browser.

239. At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website, and understood that doing so would result in the interception and transmission of users' communications to Tracking Entities.

240. Plaintiff never consented to the interception, recording, disclosure, or use of his electronic communications with the Website by the Tracking Entities. Due to Defendant's Cookie Banner, Plaintiff reasonably assumed that tracking would not occur without his consent.

241. The unauthorized interception and use of Plaintiff's electronic communications by the Tracking Entities was only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. *See* 18 U.S.C. § 2511(1)(a).

242. Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website and allowed Tracking Entities to intercept the communications of users on the Website, in order to subsequently disclose those communications to the Tracking Entities for marketing. Those disclosures were made fraudulently, based on Defendant's false representations in the Cookie Banner, and constitute unlawful invasions of privacy.

243.    As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiff has been damaged and is entitled to relief under 18 U.S.C. § 2520, including:

    a.    damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiff and any profits made by the intercepting parties as a result of the violations, or

    b.    statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

    c.    reasonable attorneys' fees and costs.

## COUNT IV
## COMMON LAW INVASION OF PRIVACY
### Intrusion Upon Seclusion
### (On Behalf of Plaintiff and the Class)

244.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 196 as though fully set forth herein.

245.    Plaintiff brings this cause of action on behalf of himself and all Class Members.

246.    Defendant has intruded upon the legally protected privacy interests of Plaintiff and the Class Members by, among other things, permitting third-party tracking technologies to collect, track, and compile users' Sensitive Information while representing to users that they needed to opt in to such collection.

247.    Plaintiff and the Class Members maintained a reasonable expectation that their communications with Defendant via the Website would remain private, specifically with respect to their Sensitive Information, including browsing activity, personal identifiers, and related metadata. Plaintiff and the Class Members expected that their interactions with the Website would not be shared with the Tracking Entities.

248. Plaintiff and the Class Members relied on Defendant's representations in the Cookie Banner, reasonably expecting that Defendant would honor its affirmative representation in the Cookie Banner that users could opt in to the use of Tracking Tools.

249. Despite Plaintiff's and the Class Members' expectations, Defendant permitted third parties to use cookies and related Tracking Tools to collect and compile users' Sensitive Information, including the categories described above. The Tracking Entities used and profited from these data to create detailed user profiles, audience segments, and targeted advertising, and to share and monetize those profiles.

250. Defendant lacked any legitimate business justification for permitting the placement and transmission of the third-party cookies and Tracking Tools that allowed Tracking Entities to access, intercept, and collect users' Sensitive Information, contrary to users' privacy choices, including express opt-outs or lack of opt-ins.

251. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class Members suffered injury, including but not limited to loss of privacy, loss of control over their Sensitive Information, diminution in value of their private data, and other compensable harms.

## COUNT V
### COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION
#### (On Behalf of Plaintiff and the Class)

252. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 196 as though fully set forth herein.

253. Plaintiff brings this cause of action on behalf of himself and all Class Members.

254. Defendant made affirmative representations to Plaintiff and the Class Members through its Cookie Banner, and related disclosures that users could opt out of, or needed to opt in to, the use of the Tracking Tools and could decline all non-necessary cookies.

255. Defendant represented that exercising those options would limit or prevent the deployment of Tracking Tools, including targeting and performance cookies, and would stop the sale or sharing of users' Sensitive Information with the Tracking Entities via cookies.

256. Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their cookie preferences.

257. These representations were false and misleading. Before users, including Plaintiff and the putative Class Members, were able to exercise the purported opt-in choice provided by Defendant, or otherwise reject all Tracking Tools or decline all non-necessary cookies, Defendant deployed the Tracking Tools to intercept and collect Plaintiff's and the Class Members' user data and transmit the same to the Tracking Entities, despite Defendant's representation in the Cookie Banner that it would not track users until they consented to the Tracking Tools.

258. Defendant knew its representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices.

259. Defendant had the technical ability to prevent post-opt-out data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential tracking technologies based on user preferences, and Defendant could have implemented such measures.

260. Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiff, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for its own commercial benefit.

261.    Plaintiff and the Class Members reasonably and justifiably relied on Defendant's misrepresentations by exercising the opt-out controls and continuing to use the Website. Had Plaintiff known that Defendant's representations were false, he would not have used the Website.

262.    Plaintiff's reliance was reasonable because Defendant presented the Cookie Banner as a mechanism for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

263.    As a direct and proximate result of Defendant's fraudulent conduct, Plaintiff and the Class Members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data. Plaintiff suffered injury, including unauthorized disclosure of his communications, loss of control over his personal information, diminution in the value of his personal data, and loss of the privacy protection Defendant represented it would provide.

264.    Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' data despite representing that such practices would cease upon opt-out and would not occur unless users opted in.

**COUNT VI**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

265.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 196 as though fully set forth herein.

266.    Plaintiff brings this cause of action on behalf of himself and all Class Members.

267.    Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiff's and the Class Members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

268.    It is unjust that Defendant retains those benefits under circumstances in which the information was collected and transmitted in breach of the representations made to users and without valid consent.

269.    Plaintiff and the Class Members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiff and the Class Members. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiff and the Class Members are entitled to the relief set forth below.

## **PRAYER**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

 a. An order certifying the Class and Subclass and making all appropriate class management orders;

 b. For an order determining that this action is properly brought as a class action and certifying Plaintiff as the representative of the respective Class and Subclass and their counsel as Class Counsel;

 c. For an order declaring the Defendant's conduct violates the statutes referenced herein;

 d. For an order finding in favor of Plaintiff, the Class, and the New York Subclass on all counts asserted herein;

 e. Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website users;

f.      An award of statutory damages or penalties to the extent available;

g.      For damages in amounts to be determined by the Court and/or jury;

h.      For pre-judgment interest on all amounts awarded;

i.      For an order of restitution and all other forms of monetary relief;

j.      An award of all reasonable attorneys' fees and costs; and

k.      Such other and further relief as the Court deems necessary and appropriate.

Dated: May 13, 2026

**SHINDLER, ANDERSON, GOPLERUD & WEESE, P.C.**

By: */s/ J. Barton Goplerud*
J. Barton Goplerud
Brian O. Marty
5015 Grand Ridge Drive, Suite 100
West Des Moines, IA 50265
Tel: (515) 223-4567
Fax: (515) 223-8887
Email: goplerud@sagwlaw.com
Email: marty@sagwlaw.com

Mark S. Reich*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: 212.363.7500
Fax: 212.363.7171
Email: mreich@zlk.com

**pro hac vice* forthcoming

*Attorneys for Plaintiff and the Proposed Class*