2026 WL 3031874
Only the Westlaw citation is currently available.
United States Court of Appeals, Ninth Circuit.

Melissa BLACK, individually and on behalf of all others similarly situated; Miles Black, individually and on behalf of all others similarly situated, Plaintiffs - Appellants,
v.
IEC GROUP, INC., doing business as Ameriben, Defendant - Appellee.

No. 25-5952
|
Argued and Submitted June 8, 2026 Seattle, Washington
|
Filed October 9, 2026

**Synopsis**
**Background:** Health plan participants brought a putative class action against health insurance plan administrator, asserting state-law claims of negligence, negligence per se, breach of contract, breach of implied contract, breach of fiduciary duty, unjust enrichment, violation of a state deceptive and unfair trade practices act, and seeking declaratory and injunctive relief, alleging that the administrator disclosed their sensitive health information to unauthorized parties without their consent. The United States District Court for the District of Idaho, Amanda K. Brailsford, J., 2025 WL 2418799, granted administrator's motion to dismiss based on lack of standing. Participants appealed.

**[Holding:]** The Court of Appeals, Tung, Circuit Judge, held that participants suffered injury in fact sufficient to confer standing.

Reversed and remanded.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Lack of Standing.

West Headnotes (10)

[1] **Federal Courts**

Court of Appeals reviews a district court's dismissal for lack of standing de novo. Fed. R. Civ. P. 12(b)(1).

[2] **Federal Courts**

On appeal from a motion to dismiss for lack of standing, a plaintiff need only show that the facts alleged, if proven, would confer standing. Fed. R. Civ. P. 12(b)(1).

[3] **Federal Courts**

The doctrine of standing is rooted in the traditional understanding of a case or controversy and limits the category of litigants empowered to maintain a lawsuit in federal court. U.S. Const. art. 3, § 2, cl. 1.

[4] **Federal Civil Procedure**

Inquiry for standing asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury. U.S. Const. art. 3, § 2, cl. 1.

[5] **Federal Civil Procedure**

An exact duplicate common-law analogue to the alleged harm is not needed for standing, but the inquiry is not an open-ended invitation for federal courts to loosen Article III based on contemporary, evolving beliefs about what kinds of suits should be heard in federal courts. U.S. Const. art. 3, § 2, cl. 1.

[6] **Federal Civil Procedure**

Tangible harms, such as physical harm or monetary loss, satisfy "injury in fact" requirement for standing; but intangible harms can too, if they have been traditionally

recognized by courts as providing basis for lawsuit, such as reputational harms or harms specified by Constitution itself, e.g., abridgement of free speech or infringement of free exercise. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 1.

[7] **Federal Civil Procedure**

Congress's judgment is instructive and important in determining whether asserted harm satisfies injury-in-fact requirement for standing, as that body is well positioned to identify intangible harms that meet minimum Article III requirements. U.S. Const. art. 3, § 2, cl. 1.

[8] **Federal Civil Procedure**

Standing must be shown claim by claim and is not dispensed in gross; but injury in fact turns on the harm a plaintiff has suffered rather than the legal theory he invokes to redress it, and where every count rests on the same injury, that inquiry yields a single answer. U.S. Const. art. 3, § 2, cl. 1.

[9] **Telecommunications**

Harm alleged by health plan participants, the health insurance plan administrator's breach of confidentiality grounded in contractual promises to keep sensitive Health Insurance Portability and Accountability Act (HIPAA)-protected health information private, constituted an "injury in fact" sufficient to confer standing to sue administrator for claims related to data breach, because it was akin to breach of confidence or contract that courts had traditionally recognized as providing basis for lawsuit. U.S. Const. art. 3, § 2, cl. 1; Social Security Act § 1171, 42 U.S.C.A. § 1320d(6).

[10] **Torts**

Under common law cause of action for breach of confidence, a defendant is liable for the unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship.

Appeal from the United States District Court for the District of Idaho, Amanda K. Brailsford, District Judge, Presiding, D.C. No. 1:23-cv-00384-AKB

**Attorneys and Law Firms**

Jeff Blake (argued), Zimmerman Law Offices PC, Willowbrook, Illinois; Thomas A. Zimmerman Jr., Zimmerman Law Offices PC, Chicago, Illinois; Bonner C. Walsh, Walsh PLLC, Grangeville, Idaho; Marc E. Dann, Brian D. Flick, and Marita I. Ramirez, Dann Law Firm, Lakewood, Ohio; for Plaintiffs-Appellants.

Darren A. Craig (argued) and Kandi K. Hidde, FBT Gibbons LLP, Indianapolis, Indiana; Nicole C. Hancock and Bradley R. Prowant, Stoel Rives LLP, Boise, Idaho; for Defendant-Appellee.

Before: Michael Daly Hawkins, William A. Fletcher, and Eric C. Tung, Circuit Judges.

**OPINION**

TUNG, Circuit Judge:

If you entrust a company to keep your sensitive health information private, but the company then discloses that information to others without your consent, have you been injured? We hold yes. The district court concluded such harm did not constitute "injury in fact" sufficient to confer Article III standing. We reverse.

**I**

Plaintiffs-Appellants Miles and Melissa Black receive health insurance from a plan administered by Defendant-Appellee IEC Group, Inc. (doing business as AmeriBen). In August 2023, Defendant sent each Plaintiff a letter informing them that some of their information was disclosed to unauthorized parties. ER-77–80. The letter explained that an associate emailed a spreadsheet containing Plaintiffs' sensitive health information to "one or more [plan] members." ER-77. The information that "may have been disclosed" included (1)


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

first and last names, (2) unique tracking numbers, (3) provider names, (4) claim numbers, (5) dates of service, and (6) the amounts billed or paid. ER-22–23 ¶ 11, 77, 79. Plaintiffs allege that "the full extent of the types of Sensitive Information, the scope of the breach, and the root cause of the breach is all within the exclusive control of the Defendant," ER-21 ¶ 7, and that Defendant "has not been forthright with information about the Breach," ER-46 ¶ 90, 48 ¶ 102.

Plaintiffs brought a class action against Defendant in the United States District Court for the District of Idaho for several state-law claims.[1] ER-20–21. Plaintiffs allege that they entrusted their sensitive health information to Defendant as a condition of their plan administration, ER-45, 47, and that Defendant expressly and impliedly promised—including through its Privacy Policy—to keep that information confidential and not disclose it to any third party without their consent, and to use reasonable methods to prevent such disclosure, ER-22, 62. Plaintiffs allege that they provided their information in reliance on that promise and on a reasonable expectation of confidentiality, and that they would not have entrusted it to Defendant absent such an agreement. ER-22, 65. Defendant breached those promises, they allege, when it disclosed their confidential information without authorization, depriving Plaintiffs of the benefit of their bargain and rendering the services they contracted for of diminished value. ER-45, 47, 63.

***2** The district court granted Defendant's Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction because it concluded that the Plaintiffs did not suffer an injury in fact and thus did not have Article III standing. ER-4, 18. The district court rejected Plaintiffs' arguments that unauthorized disclosure of private information alone or the loss of the benefit of their bargain could satisfy the injury-in-fact requirement for standing. ER-9, 11–12. Instead, it interpreted Ninth Circuit caselaw as "support[ing] a narrower rule." ER-12. "[T]o allege a concrete injury from disclosure of personal information, a plaintiff must show the nature of the information disclosed, the context of the disclosure, and other alleged injuries associated with the disclosure demonstrate an imminent and substantial injury." *Id.* (citing *Greenstein v. Noblr Reciprocal Exch.*, No. 22-17023, 2024 WL 3886977, at *1 (9th Cir. 2024)). The court concluded that Plaintiffs did not meet that standard and thus did not demonstrate a substantial likelihood of future injury. ER-13–18.

**[1]** **[2]** Plaintiffs then appealed to this court. "We review a district court's dismissal under Rule 12(b)(1) for lack of standing de novo." *Unified Data Servs., LLC v. FTC*, 39 F.4th 1200, 1209 (9th Cir. 2022). "On appeal from a motion to dismiss, a plaintiff need only show that the facts alleged, if proven, would confer standing." *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1141 (9th Cir. 2010).

## II

**[3]** Our "judicial Power" extends only to "Cases" and "Controversies." U.S. Const., art. III, § 2. To ensure we keep to our proper role, we have applied the doctrine of standing, which requires plaintiffs to have "suffered an injury in fact" that is fairly traceable to the challenged conduct and that is likely to be redressed by the court. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016). This doctrine is "rooted in the traditional understanding of a case or controversy" and "limits the category of litigants empowered to maintain a lawsuit in federal court." *Id.*

**[4]** History remains our guide in determining whether a plaintiff has standing. "Because the doctrine of standing derives from the case-or-controversy requirement, and because that requirement in turn is grounded in historical practice, it is instructive to consider whether an alleged ... harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* at 340–41, 136 S.Ct. 1540 (citing *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 775–77, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000)); *see also* *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021). As Justice Frankfurter put it, "[j]udicial power" comes into play "in matters that were the traditional concern of the courts at Westminster." *Coleman v. Miller*, 307 U.S. 433, 460, 59 S.Ct. 972, 83 L.Ed. 1385 (1939) (opinion of Frankfurter, J.). "That inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *TransUnion*, 594 U.S. at 424, 141 S.Ct. 2190.

**[5]** **[6]** **[7]** An "exact duplicate" is not needed. *Id.* But the inquiry is "not an open-ended invitation for federal courts to loosen Article III based on contemporary, evolving beliefs about what kinds of suits should be heard in federal courts." *Id.* at 424–25, 141 S.Ct. 2190. Tangible harms, such as physical harm or monetary loss, satisfy the "injury in fact" requirement; but intangible harms can too, if they have been "traditionally recognized" by courts as providing a basis for a lawsuit, such as "reputational harms" or "harms specified

by the Constitution itself"—*e.g.*, "abridgment of free speech" or "infringement of free exercise." *Id.* at 425, 141 S.Ct. 2190. Congress's "judgment is also instructive and important," as that body is "well positioned to identify intangible harms that meet minimum Article III requirements." *Spokeo*, 578 U.S. at 341, 136 S.Ct. 1540.

### III

**[8]** **[9]** Plaintiffs have alleged an injury here enough to give them standing. Standing must of course be shown claim by claim and is not "dispensed in gross," *TransUnion*, 594 U.S. at 431, 141 S.Ct. 2190, but injury in fact turns on the harm a plaintiff has suffered rather than the legal theory he invokes to redress it, and where every count rests on the same injury, that inquiry yields a single answer. The harm Plaintiffs allege consists of the unauthorized disclosure of sensitive facts about their health that they have entrusted Defendant to keep private. No one can dispute (at this stage of the litigation anyway) that the disclosed information—about when Plaintiffs received health treatment, how much they (or their insurer) spent on that treatment, and which providers they saw—is sensitive to Plaintiffs. Nor can anyone dispute that Defendant promised Plaintiffs to keep this information secret—information Defendant learned while administering Plaintiffs' insurance claims. And no one can dispute that Defendant failed to keep this information secret. The harm that Plaintiffs allege from this disclosure resembles a breach of confidence and contract that courts have long understood as providing a basis for a lawsuit.

***3** **[10]** Consider first a breach of confidence. Under this action, a defendant is liable for "the unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship." *Kamal v. J. Crew Grp., Inc.*, 918 F.3d 102, 114 (3d Cir. 2019) (quotation omitted).

The "ancient rule" of equity denoted "breach of confidence" as one of three express bases for invoking a court's jurisdiction. *See* 4 Edward Coke, Institutes of the Laws of England 84 (London, M. Flesher 1644) ("For this Court of Equity the ancient rule is good. Three things are to be judged in Court of Conscience: Covin, Accident, and breach of confidence."). A series of seminal English cases decided around the time of our Founding illustrates the action's historical pedigree. *See* Neil M. Richards & Daniel J. Solove, *Privacy's Other Path: Recovering the Law of Confidentiality*, 96 Geo. L.J. 123, 135–38 (2007). In *Duke of Queensberry v. Shebbeare*, the Court of Chancery enjoined the publication of a manuscript, belonging to the Earl of Clarendon, which was given to an individual with the understanding that it not be printed and shared. 28 Eng. Rep. 924, 925 (Ch. 1758). This case reflected "liab[ility] to be restrained," as one later authority taught, for "deriv[ing] confidential information in breach of confidence," though the case had not used those express terms. *See* Francis Gurry, *Breach of Confidence* 278 (1984).

The court was more explicit in *Yovatt v. Winyard*, in which it enjoined an employee's use of secret "recipes for veterinary medicines" that the employee had copied in "breach of trust and confidence" owed to his employer. 37 Eng. Rep. 425, 425–426 (Ch. 1820). Similarly, in *Abernethy v. Hutchinson*, the court enjoined individuals from publishing notes of lectures kept by a medical student attending the lectures because the initial disclosure by the student was either a "breach of trust" or a violation of an implied contract. 47 Eng. Rep. 1313, 1316 (Ch. 1825) (citing *Duke of Queensberry*, 28 Eng. Rep. at 924).

Later cases confirmed that breach of confidence was actionable apart from any property or copyright interest. In *Prince Albert v. Strange*, the court enjoined the exhibition of etchings of the royal family (and publication of a catalogue describing those etchings) when the defendant's possession of them "must have originated in a breach of trust, confidence, or contract." 41 Eng. Rep. 1171, 1179 (Ch. 1849). "[T]his case by no means depends solely upon the question of property," the court emphasized, "for a breach of trust, confidence, or contract, would of itself entitle the Plaintiff to an injunction." *Id.* at 1178.

In *Morison v. Moat*, the court reaffirmed the principle, recognizing that equity would restrain individuals from disclosing information they obtained in confidence. 68 Eng. Rep. 492, 501 (Ch. 1851). There, the court enjoined the "use of a secret in the compounding of a medicine" where the defendant acquired "the secret" in "breach of trust and confidence." *Id.* at 492. "That the Court has exercised jurisdiction in cases of this nature *does not*," the Vice-Chancellor said, "admit of any question." *Id.* at 498 (emphasis added). The court noted that the "grounds" for "jurisdiction" referred to "property" in some cases and "contract" in others; and in still other cases, "it has been treated as *founded upon trust or confidence*, meaning, as [the Vice-Chancellor] conceive[d], that the Court fastens the obligation on the

conscience of the party, and enforces it against him in the same manner as it enforces against a party to whom a benefit is given the obligation of performing a promise on the faith of which the benefit has been conferred." *Id.* (emphasis added). "[B]ut, upon whatever grounds the jurisdiction is founded," the court concluded, "the authorities leave no doubt as to the exercise of it." *Id.*

***4** The authorities that the court in *Morison* surveyed include those already discussed (*Duke of Queensberry, Yovatt, Abernethy, Prince Albert*). *See id.* at 499. As the court emphasized, those cases based jurisdiction upon the "ground of breach of trust and confidence." *Id.* "By those authorities, in which I most fully concur," the Vice-Chancellor stated, "and which appear to me to agree in principle with many other cases to be found in the books, I must hold myself to be bound." *Id.* Again, the court took pains to emphasize that the "principle" rested not on a violation of a "property" right, but on a "breach of confidence": indeed, the defendant in *Morison* had argued that "granting an injunction" would "give the Plaintiffs a better right than that of a patentee." *Id.* at 500. But the court rejected that argument, reasoning that "what we have to deal with here is, *not* the right of the Plaintiffs against the world" (as a patent would give), "but their right against the Defendant," who had committed a breach of confidence. *Id.* (emphasis added). Buttressing that reasoning, the court distinguished *Morison* from a patent case in which the latter "did not depend upon any breach of confidence, for there was no confidence reposed, but depended wholly on a supposed right of property in the medicine." *Id.*

These English authorities were well known across the Atlantic. Joseph Story, in his "famous treatise" on equity jurisprudence (*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 321, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999)), cited *Yovat* among other cases when he described how "Courts of Equity will restrain a party from making a disclosure of secrets, communicated to him in the course of a confidential employment." 2 Commentaries on Equity Jurisprudence § 952, at 223 (Boston, Charles C. Little & James Brown 1839). Story disabused the reader of any notion that he was speaking solely about trade secrets; the wrong in these cases pertained to a breach of faith or contract: "it matters not," he said, "whether the secrets be secrets of trade, or secrets of title, or other secrets of the party important to his interests." *Id.* In a later edition, the treatise cited *Morison v. Moat* and recognized that "a party has been restrained from using a secret ... in breach of faith or contract." 2 Commentaries on Equity Jurisprudence § 952, at 296 (Boston, Little, Brown & Co. 1853); *see also Evitt v. Price*, 57 Eng. Rep. 659 (Ch. 1827); *Pollard v. Photographic Co.*, 40 Ch. Div. 345 (1888).

American courts followed suit. In *E.I. Du Pont de Nemours Powder Co. v. Masland*, 244 U.S. 100, 37 S.Ct. 575, 61 L.Ed. 1016 (1917), Justice Holmes, writing for a unanimous Supreme Court, described the harm that a breach of confidence effects and explained that such harm provided the basis for the court's ability to entertain the case and grant relief:

> Whether the plaintiffs have any valuable secret or not[,] the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied but the confidence cannot be. Therefore[,] the starting point for the present matter is not property or due process of law, but that the defendant stood in confidential relations with the plaintiffs, or one of them. These have given place to hostility, and the first thing to be made sure of is that the defendant shall not fraudulently abuse the trust reposed in him. It is the usual incident of confidential relations. If there is any disadvantage in the fact that he knew the plaintiffs' secrets, he must take the burden with the good.

*Id.* at 102, 37 S.Ct. 575 (reversing a decree that had vacated a preliminary injunction).

In short: a trust betrayed *is* the harm. Beyond concerns of "property" or "due process," the "hostility" made upon the relationship itself, the "abuse" of the "trust reposed" in another, is itself the harm. Other cases adhered to this principle. For example, in *Corliss v. E.W. Walker Co.*, 64 F. 280 (C.C.D. Mass. 1894), the court had "granted an injunction upon the ground that the proposed use [of a photograph of a famous inventor] by the defendants would be a breach of contract and *a violation of confidence.*" *Id.* at 281 (emphasis added). It addressed "a personal right" belonging to the plaintiff, citing *Duke of Queensberry, Abernethy*, and *Prince Albert. Id.* at 282. The court later dissolved the injunction upon learning that the defendants obtained the photograph "at a public shop in Providence"—hence there was no "contract" between the parties; nor was confidence reposed in defendants to keep the photograph private. *Id.* at 282–83. The central point, however, is this: a breach of confidence was traditionally recognized as a basis for a lawsuit.

***5** Similarly, in *Stevens & Co. v. Stiles*, 29 R.I. 399, 71 A. 802 (1909), the court affirmed the grant of a preliminary injunction to restrain an employee who had, "from breach

of trust or confidence arising from the confidential relation" with his employer, sought to use the company's "books and records" to solicit customers for his own business. *Id.* at 802, 806. The court articulated the historical recognition by English courts of relief granted upon a "breach of confidence," citing *Morison, Yovatt, Abernethy*, and *Prince Albert* (among other cases), as well as Story's treatise, and it acknowledged that "[t]he same doctrine prevails in this country." *Id.* at 803–05.

The court in *Pavesich v. New England Life Ins. Co.*, 122 Ga. 190, 50 S.E. 68 (1905), understood this too: "It is well settled that, if any contract or property right *or trust relation* has been violated, damages are recoverable. There are many cases which sustain such a doctrine." *Id.* at 75 (emphasis added). The plaintiff in *Pavesich* had sued an insurance company for using a photograph of him in an advertisement for life insurance, alleging a "trespass upon plaintiff's right of privacy ... caused by breach of confidence and trust reposed" in the defendant. *Id.* at 69. The court recognized that "breach of confidence" was a harm more established than the alleged invasion of "privacy"—two harms that the plaintiff had blended in his pleadings. *Id.* at 75. Invoking a recently published article at the time by Samuel Warren and Louis Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890), the court found that the plaintiff's "right to privacy" was violated. *See Pavesich*, 50 S.E. at 74, 81.

The novelty of finding such a "privacy" right only reinforced the settled nature of (the narrower) "breach of confidence" action. As the court acknowledged, "[i]t is to be conceded that prior to 1890 every adjudicated case, both in this country and in England, which might be said to have involved a right of privacy, was not based upon the existence of such right, but was founded upon a supposed right of property, or *a breach of trust or confidence*, or the like." *Id.* at 69 (emphasis added).

To be sure, the *Pavesich* case (and others) marked the advent of the privacy tort, established in our law today to the point where "breach of confidence" has nearly been eclipsed (though it appears more recently to have made a comeback). *See* Richards & Solove, *Privacy's Other Path*, at 146–56; Alan B. Vickery, Note, *Breach of Confidence: An Emerging Tort*, 82 Colum. L. Rev. 1426, 1428–30 (1982). None of this is all too surprising: in many cases a plaintiff would have no need to invoke a narrower "breach of confidence" theory of liability when it has resort to a broader theory of "privacy," which does not depend on the existence of (and thus proof of) a relationship of confidence and trust between the parties.

But whether "breach of confidence" has been overshadowed today is beside the point. The point is that, around our Constitution's framing, "breach of confidence" provided a basis for a suit in English or American courts; and that is enough for us to conclude that it serves as a "close historical or common-law analogue for [Plaintiffs'] asserted injury" to allege standing under Article III. *TransUnion*, 594 U.S. at 424, 141 S.Ct. 2190; *see also Vt. Agency*, 529 U.S. at 776, 120 S.Ct. 1858 (examining "the period immediately before and after the framing of the Constitution").[2]

***6** "Breach of contract" reinforces the validity of the analogy we draw today. A relationship of trust and confidence is often formed by contract or an implied promise. And so where there is a "breach of confidence," there often is a "breach of contract" too, as the historical cases recognized. *See supra* at ––––––––. And here Plaintiffs have alleged a confidential relationship grounded in promises made by Defendant and a breach of those promises. ER-22 ¶ 10, 23 ¶ 14, 63 ¶ 164. No one can doubt that actions for breach of contract, even without any allegations of pecuniary or physical injury, were available at common law. *See* Joseph Chitty, A Treatise on the Law of Contracts 978 (Springfield, Mass., G. & C. Merriam 1860); William T. Brantly, Law of Contract 247–48 (Baltimore, Harold B. Scrimger 1893); *see also, e.g., Cowley v. Davidson*, 13 Minn. 92, 104–05 (1868); *Devendorf v. Wert*, 42 Barb. 227, 229 (N.Y. Sup. Ct. 1864). And that pedigree combined with the historical recognition of the "breach of confidence" action in equity make clear that Plaintiffs have standing here at least at this stage of the pleadings.[3]

Congressional judgment further confirms that the disclosure of this information is a concrete injury. *Spokeo*, 578 U.S. at 341, 136 S.Ct. 1540; *TransUnion*, 594 U.S. at 425, 141 S.Ct. 2190. Congress passed the Health Insurance Portability and Accountability Act (HIPAA) and subsequent amendments to protect certain sensitive health information from disclosure. While the Act does not provide a private cause of action, it does prohibit disclosure, and even provides for criminal liability for, under certain conditions, knowingly "disclos[ing] individually identifiable health information to another person." 42 U.S.C. § 1320d-6(a)(3). No one appears to dispute that the information disclosed here was covered by the Act. *See* 42 U.S.C. § 1320d(6) (defining "individually identifiable health information"). However mundane such disclosed data might seem to some—*e.g.*, the patient's name, the provider's name, the dates of service, the amounts billed

—Congress made a judgment that such information was sensitive enough to entitle it to statutory protection. And it is not hard to see why. Such information, no matter how seemingly benign, can reveal one's most private health concerns—for example, others might learn that a patient is suffering from a debilitating mental illness because he has been seeing a psychiatrist for daily therapy sessions for the past three months, or that a patient is struggling with infertility given the amount of time spent at a fertility clinic. Disclosure of such sensitive information resulting from a breach of trust is a harm.

* * *

***7** The Supreme Court has instructed that a plaintiff, bearing the burden to show standing, must identify a close historical analogue for their claimed injury. Plaintiffs have done so here. Their allegation that Defendant disclosed sensitive health information that Plaintiffs entrusted Defendant to keep private is akin to a breach of confidence or contract that English and American courts have traditionally recognized as providing a basis for a lawsuit. We therefore reverse the district court's judgment to the contrary and remand for further proceedings.

**REVERSED AND REMANDED.**

**All Citations**

--- F.4th ----, 2026 WL 3031874

Footnotes

1 Plaintiffs brought state-law claims of (1) Negligence, (2) Negligence Per Se, (3) Breach of Contract, (4) Breach of Implied Contract, (5) Breach of Fiduciary Duty, (6) Unjust Enrichment, (7) Declaratory and Injunctive Relief, and (8) a claim under Florida's Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201 *et seq.*). ER-52–68.

2 The Supreme Court in *TransUnion* observed that “disclosure of private information” is a harm “traditionally recognized as providing a basis for lawsuits in American courts.” *Id.* at 425, 141 S.Ct. 2190. That could potentially provide another basis for standing here, but we need not decide that today. *See* *Popa v. Microsoft Corp.*, 153 F.4th 784, 790–91 (9th Cir. 2025). We note that our sister circuits have apparently adopted different approaches as to whether the tort's element of “publicity” needs to be alleged in order to demonstrate standing. *Compare* *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1245 (11th Cir. 2022) (en banc); *Shields v. Prof. Bureau of Collections of Md., Inc.*, 55 F.4th 823, 828–29 (10th Cir. 2022); *Nabozny v. Optio Sols. LLC*, 84 F.4th 731, 735 (7th Cir. 2023); *Barclift v. Keystone Credit Servs., LLC*, 93 F.4th 136, 145 & n.4 (3d Cir. 2024); *Holmes v. Elephant Ins. Co.*, 156 F.4th 413, 425 (4th Cir. 2025), *with* *Pileggi v. Wash. Newspaper Publ'g Co., LLC*, 146 F.4th 1219, 1230–31 (D.C. Cir. 2025); *Salazar v. Paramount Glob.*, 133 F.4th 642, 647 n.4, 648 n.6 (6th Cir. 2025); *Salazar v. NBA*, 118 F.4th 533, 542 n.6 (2d Cir. 2024). Because we hold that “breach of confidence” provides a basis for standing here, we need not decide whether “disclosure of private information” does too.

3 We note that the Third Circuit has “hesitate[d] to conclude” that “breach of confidence” was traditionally recognized as providing a basis for a suit. *Barclift*, 93 F.4th at 145 n.3. But as the authorities discussed in our opinion show, “breach of confidence” is anything but new. *See supra* at —— – ——; *see also* *Barclift*, 93 F.4th at 157 & n.13 (Matey, J., concurring in part, dissenting in part, and dissenting in the judgment). We also note that the Seventh and Fourth Circuits have questioned whether a “breach of contract” can give rise to standing when damages are merely nominal. *Dinerstein v. Google*, 73 F.4th 502, 521 (7th Cir. 2023); *see also* *Freeman v. Progressive Direct Ins. Co.*, 149 F.4th 461, 467 (4th Cir. 2025). But it appears to us that nominal damages are a historical recognition that a party is harmed by the very act of the breach itself even when no pecuniary damage accompanies such breach—in that vein, it is very much like a trespass resulting from an intruder placing merely one foot on the owner's property without causing any physical harm to the property; no matter how little, a breach of contract is still a breach, and a trespass still a trespass. *See* Thomas M. Cooley, A Treatise on the Law of Torts 63 (Chicago, Callaghan & Co. 1879); Theodore Sedgwick, A Treatise on the Measure of Damages 57–58 (New York, Baker, Voorhis & Co. 1874); *Springer v. Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284, 292–93 (6th Cir. 2018) (Thapar, J., concurring); *Denning v. Bond Pharmacy, Inc.*, 50 F.4th 445, 451 (5th Cir. 2022). In any event, the Third, Seventh, and Fourth Circuits did not have occasion to address the particular allegations at issue here—a breach of confidentiality grounded in contractual promises to keep sensitive HIPAA-protected health information private—and so those cases are readily distinguishable.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.